IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWN BULLARD, | : |
| Plaintiff, | : CIVIL ACTION |
| v. | : |
| | : NO. 10-7223 |
| CITY OF PHILADELPHIA, | : |
| Defendant. | : |

MEMORANDUM OPINION

**RUFE, J.**                                                                                                                                  **February 13, 2012**

        This is a civil rights action arising out of the City of Philadelphia's demolition of Plaintiff's property. Plaintiff alleges that the City failed to provide him with constitutionally adequate notice prior to demolition in violation of his procedural and substantive due process rights under the United States Constitution. The parties have filed cross-motions for summary judgment. For the reasons that follow, Plaintiff's Motion will be granted in part.

**I. FACTUAL BACKGROUND**[1]

        When a building located on private property within city limits "is being maintained in a condition which is found to be hazardous, structurally unsound, dangerous or unfit for human habitation and in violation of any law or ordinance," the City of Philadelphia (the "City") is authorized to take certain actions to ensure that the "unsafe" or "imminently dangerous" condition created by the structure is eliminated.[2] The Philadelphia Department of Licenses and

---

[1] The facts are undisputed except where otherwise noted.

[2] 53 Pa. Stat. § 14611; see also Philadelphia Property Maintenance Code §§ PM-307.0 and 308.0.

Inspections ("L&I") begins by declaring the building to be a nuisance, and serving notice upon the "registered owner of the building . . . directing the abatement of the nuisance."[3]  "The notice shall reasonably specify such repairs or such other measures, including demolition, as may be necessary to abate the nuisance and shall require their completion within a reasonable time not less than thirty days from the date of service of the notice."[4]

The Emergency Service and Abatement Unit (the "Unit"), a subdivision of L&I, is responsible for the City's demolition and abatement program.[5]  Scott Mulderig is the Unit's Chief.[6]  The Unit's inspectors are responsible for responding to complaints about properties and issuing notices of violations if they determine a property is "unsafe" or "imminently dangerous."[7]  According to Chief Mulderig, a Unit Inspector may designate a property "unsafe" when, upon visual inspection, the inspector determines that there is "a structural component that is deteriorated or failed."[8]  No independent testing is done to determine whether structural elements have failed.[9]  A property is "imminently dangerous" when a structural component has failed and the building is in danger of collapsing.[10]  Both designations involve a failed structural element;

---

[3] 53 Pa. Stat. § 14611.

[4] Id.

[5] Stipulated Statement of Uncontested Material Facts ¶¶ 1-2.

[6] Stipulated Statement of Uncontested Material Facts ¶ 4.

[7] Stipulated Statement of Uncontested Material Facts ¶¶ 3, 5.

[8] Mulderig Dep. 24:5-6, Apr. 29, 2011.

[9] Stipulated Statement of Uncontested Material Facts ¶ 6.

[10] Mulderig Dep. 25:10-12.

the difference between "unsafe" and "imminently dangerous" is whether the structure is in danger of collapse.[11]  As with an "unsafe" classification, an "imminently dangerous" classification is made after a visual inspection only and without any independent testing done to verify the Unit's classification.[12]

A Unit Inspector who determines that the property is "unsafe" or "imminently dangerous" sends a violation notice on behalf of the City to the record owner of the property.[13]  A standard notice indicates that the owner must demolish or repair the property, and that failure to do so may result in the City demolishing the property.[14]  The Emergency Services and Abatement Unit Field Manual (the "Field Manual") provides that an owner has thirty days within which to comply in the case of an "unsafe" violation and ten days to comply in the case of an "imminently dangerous" violation.[15]  If an owner fails to comply within the time allowed, the City may demolish or repair the building and charge the owner for the cost of demolition or repair; Chief Mulderig has the final authority to order that a building be demolished.[16]

A property designated as "unsafe" or "imminently dangerous" may be subject to demolition by the City, using either a curb-side bid process or a standard procurement process,

---

[11]  Mulderig Dep. 25:19-22.

[12]  Stipulated Statement of Uncontested Material Facts ¶ 6.

[13]  Stipulated Statement of Uncontested Material Facts ¶¶ 8-9.

[14]  Stipulated Statement of Uncontested Material Facts ¶¶ 10-11.

[15]  Emergency Servs. & Abatement Unit Field Manual ("Field Manual") at 2; Mulderig Dep. 31:11-19; Sweeney Dep. 57:21-58:9, Apr. 25, 2011.

[16]  Mulderig Dep. 57:20-23.

pursuant to written guidelines contained in the Field Manual.[17]  A standard procurement process requires demolition bids to be solicited and a contractor to be chosen by the City's Procurement Department.[18]  A curb-side bid process is typically used in emergency situations where immediate demolition is necessary.[19]  The Unit solicits bids from demolition contractors on-site at the property subject to demolition; the winning contractor demolishes the building immediately after winning the bid.[20]  Before either process occurs, however, the Field Manual requires that an inspector "[c]heck to ensure the owner received notice . . . [and] to see if the property has been sold and if there is a new owner; if there is a new owner, [an inspector must] notify the [new] owner and update the case in the database."

On July 12, 2010, L&I determined that the property located at 1603 Willington Street in Philadelphia (the "Property"), was "imminently dangerous" in violation of Philadelphia Maintenance Code Section 308.[21]  That same day, the City mailed a notice of violation to Frankie Thompson, the record owner of the Property.[22]  Ms. Thompson was deceased at the time.[23]

---

[17]  Stipulated Statement of Uncontested Material Facts ¶¶ 13-14.

[18]  Stipulated Statement of Uncontested Material Facts ¶ 13.

[19]  Id.

[20]  Id.

[21]  Stipulated Statement of Uncontested Material Facts ¶ 15.

[22]  Stipulated Statement of Uncontested Material Facts ¶ 16.

[23]  Stipulated Statement of Uncontested Material Facts ¶ 25.

Plaintiff Shawn Bullard owns a student housing and real estate investment firm.[24]  In this capacity, he buys properties located in Philadelphia, renovates them, and then rents the properties to college students.[25]  He has been in the business for about seven years and owns eleven properties.[26]  Bullard had been interested in buying the Property for several years before July 2010.[27]  He had seen the Property on many occasions and had periodically checked public records to determine if the Property was subject to a Philadelphia Property Maintenance Code violation; none of his searches revealed a violation on the Property.[28]  Bullard purchased the Property on July 29, 2010.[29]  Prior to becoming the record owner, he began to make preparations to renovate the Property.[30]  On July 18, 2010, he applied for a building permit, but was denied a permit because of the July 12, 2010 violation on the Property.[31]  Bullard was not aware of the nature or status of the violation at that time.[32]

On July 23, 2010, Inspector Thomas Sweeney visited the Property in response to a call he received through the City's municipal radio system suggesting that the Property was in violation

---

[24] Bullard Dep. 6:16-20, Apr. 29, 2011.

[25] Bullard Dep. 8:5-9:14.

[26] Bullard Dep. 6:21-23; 9:19-24.

[27] Bullard Dep. 17:4-19:8.

[28] Bullard Dep. 20:5-16.

[29] Stipulated Statement of Uncontested Material Facts ¶ 17.

[30] Bullard Dep. 32:19-22.

[31] Bullard Dep. 33:11-15.

[32] Stipulated Statement of Uncontested Material Facts ¶ 17;  Bullard Dep. 46:17-47:20.

of the Philadelphia Property Maintenance Code.[33] When Sweeney assessed the Property, he was unaware that another inspector had previously assessed the Property and found it "imminently dangerous."[34] Sweeney made a visual inspection of the Property and determined that it was "unsafe."[35] He affixed a blaze orange "Notice of Violation" sticker on the Property stating:

> THIS POSTER SERVES AS NOTICE TO YOU THAT THE DEPARTMENT OF LICENSES AND INSPECTIONS HAS DETERMINED THAT THIS PREMISES IS IN VIOLATION AND **UNSAFE** PURSUANT TO PROPERTY MAINTENANCE CODE **SECTION PM- 307.0.**
>
> YOU ARE ORDERED TO REPAIR OR DEMOLISH THE PREMISES WITHIN **30 DAYS** OF THIS NOTICE. YOU ARE REQUIRED TO OBTAIN ALL NECESSARY PERMITS TO REPAIR OR DEMOLISH THE PREMISES. IF YOU FAIL TO OBEY THIS ORDER, THE STRUCTURE IS SUBJECT TO DEMOLITION BY THE CITY AT ANYTIME AFTER THE EXPIRATION OF THE 30 DAYS FROM THE NOTICE. THE CITY WILL STUCCO THE PARTY WALLS EXPOSED BY THE DEMOLITION IN ACCORDANCE WITH ALL APPLICABLE PROVISIONS OF THE PHILADELPHIA CODE.
>
> YOU WILL BE BILLED FOR ALL COSTS INCURRED AND ADMINISTRATIVE FEES.
>
> FAILURE TO PAY THESE COSTS AND FEES WILL RESULT IN LIENS BEING PLACED AGAINST THE TITLE TO THE PREMISES.[36]

The posted notice also provided that the owner had five days to appeal the violation.[37] Bullard was present at the Property at the time Sweeney posted the notice at the Property.[38] Sweeney told

---

[33] Stipulated Statement of Uncontested Material Facts ¶ 18.

[34] Stipulated Statement of Uncontested Material Facts ¶ 27.

[35] Stipulated Statement of Uncontested Material Facts ¶ 21.

[36] Stipulated Statement of Uncontested Material Facts ¶ 22.

[37] Notice of Violation at 2.

[38] Stipulated Statement of Uncontested Material Facts ¶ 23.

6

Bullard to hire an engineer to inspect the Property, which Bullard did the following day.[39]

On July 24, 2010, as a consequence of Sweeney's July 23, 2010 visit to the Property, the City sent a second violation notice to the late Thompson, who was still the record owner of the Property at the time.[40] This automatically-generated notice designated the Property as "imminently dangerous" based on the July 12, 2010 assessment.[41] Bullard was not sent this notice because he was not yet the record owner of the Property.[42]

On July 24, 2010, Bullard began repairing the Property. He met with Mulderig and Sweeney on several occasions between July 24, 2010 and August 4, 2010, to discuss how best to proceed with his repairs.[43] Mulderig encouraged Bullard to follow the suggestions contained in the engineer's report, which was provided to Bullard on July 29, 2010, and to begin working before the necessary permits were obtained from the City.[44] During the meetings, neither Mulderig nor Sweeney provided Bullard with copies of the violations; they did not ensure that Bullard knew that Property was classified as imminently dangerous, and never informed Bullard that he had ten days to make the repairs and avoid demolition, and not the thirty days that the

---

[39] Stipulated Statement of Uncontested Material Facts ¶ 26.

[40] Stipulated Statement of Uncontested Material Facts ¶ 24.

[41] Id.

[42] Id.

[43] Stipulated Statement of Uncontested Material Facts ¶¶ 28-30.

[44] Mulderig Dep. 40:14-19 ("Q. Now, you don't dspute that at the meeting with Mr. Bullard you told him to start making repairs immediately and that a permit would catch up, correct? A. That's absolutely correct. Life safety over paperwork anytime.").

posted notice provided.[45]

On August 4, 2010 at 8:30 p.m., Bullard received a phone call from Sweeney informing him that the Property would be demolished the following day and that to stop the demolition he would need to secure a "TRO."[46] At the time, Bullard was unfamiliar with the term "TRO" ("temporary restraining order") and had no idea how to obtain such an order.[47] According to Mulderig and Sweeney, the decision to demolish the Property was a result of Bullard's failure to conform his repairs to the procedure suggested in the engineer's report.[48] Mulderig believed that Bullard was attempting to proceed with renovations to the Property while attempting to repair the Property's structural issues and that the renovations caused further structural damage to the Property.[49] He therefore ordered that the curb-side bid process be followed. According to Bullard, Mulderig told him that the demolition was to serve as a "slap in the face" for not following the engineer's report; he maintains that his repairs did not undermine the structural integrity of the building.[50]

Not wanting to incur the cost of demolition done by the City, Bullard attempted to demolish the Property using his own resources. He was prevented from doing so by Unit

---

[45] Stipulated Statement of Uncontested Material Facts ¶¶ 28-30; Mulderig Dep. 40:7-13.

[46] Stipulated Statement of Uncontested Material Facts ¶ 31; Bullard Dep. 54:15-18; 56:10-18.

[47] Bullard Dep. 54:19-55:7.

[48] Mulderig Dep. 63:17-64:7; 67:5-8.

[49] Id.

[50] Bullard Dep. 60:17-61:2.

officials, who had arrived to facilitate the demolition.[51] The City demolished the building by a curb-side bid process on the morning of August 5, 2010.[52] Just before the demolition on August 5, 2010, a City representative handed Bullard a violation notice providing that the Property was "imminently dangerous," and that Bullard had five days to appeal the violation.[53]

Bullard brings this action pursuant to 42 U.S.C. § 1983, alleging that the City violated his Fourteenth Amendment right to procedural due process (Count I) when it demolished his Property without proper notice and his Fourth Amendment right to substantive due process (Count II) by seizing and demolishing the Property on August 5, 2010. The parties have filed cross-motions for summary judgment, in which both assert that there exist no genuine disputes as to any material facts and that they are entitled to summary judgment in their favor. For the following reasons, the Court will grant Bullard's Motion in part.

## II. STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54] Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[55] A fact is "material" if it could affect the

---

[51] Stipulated Statement of Uncontested Material Facts ¶ 36; Bullard Dep. 57:2-21.

[52] Stipulated Statement of Uncontested Material Facts ¶ 37.

[53] Stipulated Statement of Uncontested Material Facts ¶¶ 34-35.

[54] Fed. R. Civ. P. 56(a), (c)(1).

[55] Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).


outcome of the suit, given the applicable substantive law.[56] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[57]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[58] Further, a court may not weigh the evidence or make credibility determinations.[59] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[60] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[61] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[62] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[63] "The rule is no

---

[56] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[57] Id.

[58] Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).

[59] Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

[60] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[61] Anderson, 477 U.S. at 249-50 (citations omitted).

[62] Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

[63] Celotex, 477 U.S. at 322; Wisniewski v. Johns–Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

different where there are cross-motions for summary judgment."[64]

### III. DISCUSSION

"Section 1983 is not a source of substantive rights;" rather, it is a procedural vehicle for vindicating rights elsewhere conferred.[65] "To establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution . . . committed by a person acting under the color of state law."[66] Thus to prevail, Bullard must show both that the demolition of his Property violated his procedural or substantive due process rights, and that the acts of those responsible for the demolition may be attributed to the City.

**A.     Constitutional Violation**

    1.     <u>Fourteenth Amendment Procedural Due Process</u>

The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."[67] Procedural due process requires that a governmental deprivation of a protected interest be preceded by notice and an opportunity to be heard.[68] Here, it is undisputed that Bullard had a protected interest in the Property.[69] Therefore, the Court need only determine whether he received adequate notice and an

---

[64] <u>Lawrence v. City of Phila.</u>, 527 F.3d 299, 310 (3d Cir. 2008).

[65] <u>Sameric Corp. of Del., Inc. v. City of Phila.</u>, 142 F.3d 582, 590 (3d Cir. 1998) (citing <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 816 (1985)).

[66] <u>Natale v. Camden Cnty. Corr. Facility</u>, 318 F.3d 575, 580-81 (3d Cir. 2003).

[67] U.S. Const. amend. XIV, § 1.

[68] <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422, 428 (1982) (citing <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313 (1950)).

[69] <u>United States v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 49 (1993).

opportunity to be heard.

"Due process does not require that a property owner receive actual notice before the government may take his property."[70] The notice provided must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[71] The opportunity to present objections must come "at a meaningful time and in a meaningful manner;" this typically requires a pre-deprivation opportunity to be heard.[72] However, pre-deprivation hearing is not always required. "[S]ummary administrative action may be justified in emergency situations."[73] "[W]here there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist . . . [,] the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion."[74]

The notice provided here did not comport with due process; under the totality of the circumstances, the notice provided to Bullard as the legal owner of the Property at the time of the demolition was insufficient to apprise him of the pendency of the action and afford him an opportunity to object.[75]

---

[70] Jones v. Flowers, 547 U.S. 220, 226 (2006).

[71] Id. (quoting Mullane, 339 U.S. at 314) (internal quotation marks omitted).

[72] B&G Constr. Co. v. Dir., Office of Workers' Comp. Programs, 662 F.3d 233, 352 (3d Cir. 2011) (quoting Matthews v. Eldridge, 424 U.S. 319, 333 (1976)).

[73] Elsmere Park Club, L.P. v. Town of Elsmere, 542 F.3d 412, 417 (3d Cir. 2008) (quoting Hodel v. Va. Surface Mining & Recl. Ass'n, 452 U.S. 264, 300 (1981)).

[74] Id. at 418 (quoting Catanzaro v. Weiden, 188 F.3d 56, 63 (2d Cir. 1999)).

[75] Sending notice to the record owner of a property is constitutionally sufficient where such notice was reasonably calculated to reach the intended recipient, in the absence of return receipt indicating that anything had

The Court begins by noting that Pennsylvania law requires that the notice provided to property owners regarding a nuisance on their property specify the repairs necessary to abate the nuisance and require completion of such repairs "within a reasonable time *not less than thirty days* from the date of service of the notice."[76]  Here, less than 30 days elapsed between the initial designation on July 12, 2010, and demolition on August 5, 2010.  Therefore, even if Bullard was served with notice of the violation on the day the first "imminently dangerous" classification was made, he was not provided with "reasonable time" to abate the Philadelphia Property Maintenance Code violation.

There is no evidence that before the day of demolition, the City ever notified Bullard that the Property was "imminently dangerous."  Neither Sweeney nor Mulderig testified that they informed Bullard that the Property had been so designated.  Although Bullard had notice that the Property was not in compliance with the Philadelphia Property Maintenance Code, as evidenced from his meetings with Sweeney and Mulderig and his attempt to bring the Property into compliance, there is no evidence that the City notified Bullard that the Property was designated "imminently dangerous," or that Bullard was apprised of his right to appeal this designation.

Bullard was present when Sweeney visited the Property on July 23, 2010 and posted the blaze orange notice of violation designating the Property as "unsafe."  The posted notice informed Bullard that he had 30 days to demolish or repair the Property, after which time the

---

gone awry.  Jones, 547 U.S. at 226-27.  Here, while the July 12 and 24 notices sent to Thompson may have been constitutionally sufficient as to Thompson, Thompson was not the record owner of the Property at the time of the demolition; Bullard was.  The City had knowledge of this fact, yet failed to send written notice of the "imminently dangerous" designation to Bullard before the day of demolition.

[76] 53 Pa. Stat. § 14611 (emphasis added).

Property would be subject to demolition.  Sweeney was aware that Bullard knew of this notice, yet he never ensured that Bullard received notice that the Property also had been designated as "imminently dangerous" and thus, had ten days to repair or demolish the Property rather than thirty.  The Property was demolished less than two weeks after the thirty-day "unsafe" notice was posted.  The only notice that the demolition would occur sooner than thirty days after the notice was posted was Sweeney's telephone call to Bullard on the eve of demolition.

While the Court recognizes that "summary administrative action may be justified in emergency situations . . . where there is competent evidence allowing the official to reasonably believe that an emergency does in fact exist,"[77] the City has not come forth with competent evidence that an emergency did in fact exist.  The City has not supported Mulderig's conclusory deposition testimony that an emergency existed with evidence that the structural integrity of the Property was so weakened by Bullard's attempted repairs so as to create a danger of immediate collapse.  The City has failed to produce competent evidence that the structural integrity of the Property was any weaker on August 5, 2010 when the City demolished the Property, than it was on July 12, 2010 and July 23, 2010, to justify the sudden and immediate demolition without constitutionally sufficient notice.

Moreover, even in the context of an emergency, the Field Manual's emergency demolition procedures require verification that the owner received notice.  The Manual specifically provides: "Check to see if the property has been sold and if there is a new owner.  If there is a new owner, notify the new owner and update the case in the database."[78]  Although the

---

[77] Elsmere Park, 542 F.3d at 41-18 (quoting Hodel, 452 U.S. at 300 and Catanzaro, 188 F.3d at 63).

[78] Field Manual at 6.

City ensured that Bullard received notice that the Property was imminently dangerous on August 5, 2010, such notice was insufficient to comport with due process because Bullard was deprived of his opportunity to present his objections. The August 5 notice provided that Bullard had 5 days to appeal the designation; during the appeal, the City would have been prevented from demolishing the Property. Bullard was deprived of this opportunity when the City demolished the Property before an appeal could be filed. Further, Mulderig had actual knowledge the Bullard owned the Property and had several opportunities during meetings with Bullard to directly inform Bullard of the nature of the violation and the right he had to appeal the violation. It is undisputed that he never provided such notice until the day of demolition, depriving Bullard of his right to appeal and halt the demolition.

Bullard has established that the City failed to provide him with constitutionally sufficient notice prior to demolishing his Property on August 5, 2010, and the City has failed to justify its failure to so with competent evidence that an emergency in fact existed. Bullard has therefore established a constitutional violation of his due process rights under the Fourteenth Amendment. If this constitutional violation may be attributed to the City, then summary judgment in favor of Bullard and against the City on Count I is warranted.

    2.    <u>Fourth Amendment Substantive Due Process</u>

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[79] Fourth Amendment

---

[79] U.S. Const. amend. IV.

substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them."[80] To establish a Fourth Amendment due process violation Bullard must show that the City's actions were unreasonable; this involves a "careful balancing of governmental and private interests."[81]

It is undisputed that a seizure occurred here.[82] However, a genuine issue of material fact prevents the Court from determining whether the City's decision to demolish the Property was reasonable. The reasonableness of the demolition itself is a different question than whether its was permissible to do so without constitutionally sufficient procedural due process. Mulderig testified that he believed that an emergency existed; Bullard testified that Mulderig told him that the demolition was to serve as a "slap in the face" for not following the engineer's report.[83] Whether the decision to demolish the Property was reasonable depends on whether the fact-finder finds more credible Mulderig's testimony that the decision was made out of a concern for the safety of the community or Bullard's testimony that the demolition was not a result of an emergency but rather a "slap in the face."

The City's seizure of the Property may not rise to the level of a substantive due process violation if the fact-finder concludes that Mulderig reasonably believed that an emergency existed. However, if the fact-finder finds credible Bullard's testimony that Mulderig told him

---

[80] Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 172 (3d Cir. 2001) (quoting Collins v. Harker Heights, 503 U.S. 115, 125 (1992)) (internal quotation marks omitted).

[81] Sodal v. Cook County, 506 U.S. 56, 71 (1992).

[82] See id. at 68; Def.'s Resp. to Pl.'s Mot. Summ. J. at 18.

[83] Bullard Dep. 60:17-61:2.

that the demolition was a "slap in the face," and concludes therefore that Mulderig's stated belief was not credible, the City's seizure would arise to a level of a substantive due process violation. A genuine dispute of material fact prevents the Court from determining the reasonableness of the City's action as a matter of law at this time. The Court will therefore deny both motions with respect to Count II.

**B.     Municipal Liability**

Having determined that Bullard has established a constitutional violation in Count I, the Court now must determine whether this violation is attributable to the City. Defendant argues that Bullard has failed to establish that the City can be held liable under Monell v. Department of Social Services of New York[84] for the alleged constitutional violations by its employees. In Monell, the Supreme Court held that "municipalities and other local government units [are] included among those persons to whom § 1983 applies."[85] For a city to be liable under § 1983, a plaintiff must show that "the [c]ity was responsible for [the] constitutional violation[]."[86] A plaintiff must establish that the due process violation occurred pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [City] officers" or "pursuant to governmental 'custom' even though such custom has not received formal approval through the [government's] official decisionmaking channels."[87] "[A] plaintiff shows that a policy existed 'when a decisionmaker possess[ing] final authority to establish municipal policy

---

[84] 436 U.S. 658 (1978).

[85] Id. at 690.

[86] Startzell v. City of Phila., 533 F.3d 183, 204 (3d Cir. 2008).

[87] Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690-91 (1978).

with respect to the action issues an official proclamation, policy, or edict.' A plaintiff may establish a custom . . . 'by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'"[88] "[C]ustom may be established by proving knowledge of, and acquiescence to, a practice."[89]

    Bullard has shown that Scott Mulderig, Chief of the Unit and the City employee with full and final authority to order that a property be demolished, directed that the Property be demolished.[90] Mulderig testified that the procedures implemented in this case were regularly implemented by the Unit. Further, this Court has previously addressed the City's custom of making the decision to demolish, and then, within hours, soliciting bids from contractors and demolishing the building, and found that such a procedure does not comport with due process.[91] The procedural due process violation that Bullard has established may be attributed to the City. Accordingly, the Court will enter summary judgment in favor of Bullard and against the City on Count I.

---

[88] Watson v. Abinton Twp., 478 F.3d 144, 155-56 (2007).

[89] Id. at 156.

[90] Mulderig Dep. 57:20-23; 60:16-19; 63:17-24.

[91] Gordon v. City of Phila., No. 07-5039, 2009 WL 2710247, at *5 (E.D. Pa. Aug. 28, 2009) (Tucker, J.) ("The City's demolition decision and its execution were made in accordance with apparent City 'custom' or 'policy,' allowing the City to make a decision to demolish, and then within hours to solicit bids from contractors for demolition, and have the contractor demolish the property within three hours of acceptance of the bid. This 'custom' is in direct contravention to the written policies and procedures in the Philadelphia Administrative Code, outlining the steps and time frames the City must abide by when it decides to demolish a citizens property.").

## IV. CONCLUSION

Bullard has established that the City violated his right to procedural due process when City officials authorized the demolition of his Property without first affording him an opportunity to present his objections. The Court will therefore grant Bullard's motion with respect to the procedural due process claim contained in Count I. However, a genuine dispute of material fact prevents the Court from determining whether the City violated Bullard's substantive due process rights. Consequently, the cross-motions for summary judgment will be denied with respect to Count II.

An appropriate Order follows.